**ORAL ARGUMENT REQUESTED**
No. 25-4121

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

———————————

UNITED STATES OF AMERICA, et al.,

Plaintiffs-Appellees

v.

FOURPOINT RESOURCES, LLC,

Defendant-Appellee

------------------------------

UTE INDIAN TRIBE OF THE UINTAH AND OURAY RESERVATION,

Movant-Appellant

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
The Honorable Judge Robert J. Shelby, No. 2:24-cv-00723-RJS-DBP

———————————

BRIEF FOR THE UNITED STATES AS APPELLEE

———————————

ADAM R.F. GUSTAFSON
  Principal Deputy Assistant Attorney
  General

ROBERT N. STANDER
  Deputy Assistant Attorney General

JASON LEE
  Attorney
  Department of Justice
  Environmental and Natural Resources
   Division
  Appellate Section
  P.O. Box 7415
  Washington, D.C.  20044
  (202) 598-3394

# TABLE OF CONTENTS

**PAGE**

STATEMENT OF JURISDICTION ........................................................ 1

STATEMENT OF THE ISSUE............................................................... 1

STATEMENT OF THE CASE ................................................................ 2

    A.    Factual Background ................................................................. 2

    B.    Procedural Background ........................................................... 9

STANDARD OF REVIEW ................................................................... 17

SUMMARY OF ARGUMENT................................................................ 18

ARGUMENT

    The district court correctly held that the Tribe failed to identify
    any cognizable injury-in-fact, and therefore, could not establish
    standing to challenge entry of the parties' consent decree. .......... 21

        A.    Intervention and Standing Requirements. .................. 21

        B.    The Tribe suffered no injury-in-fact because EPA
            provided the consultation that the Tribe claims it failed
            to receive...................................................................... 23

        C.    The Tribe fails to demonstrate that it suffered any
            injury to its sovereign interests. .................................. 27

        D.    The Tribe fails to demonstrate that it suffered any
            injury to its quasi-sovereign interests. ........................ 37

        E.    The Tribe fails to demonstrate that it suffered any
            economic injury. ........................................................... 43

CONCLUSION ........................................................................................... 51

STATEMENT REGARDING ORAL ARGUMENT

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF DIGITAL SUBMISSION

# TABLE OF AUTHORITIES

## Cases

*Alfred L. Snapp & Son, Inc. v. Puerto Rico,*
    458 U.S. 592 (1982) .............................................27, 29, 33, 35-36, 39-40

*Arizona v. Navajo Nation,*
    599 U.S. 555 (2023) ..........................................................................49-50

*Citizens for Const. Integrity v. United States,*
    57 F.4th 750 (10th Cir.), *cert. denied*, 144 S. Ct. 94 (2023)............22-23

*Day v. Bond,*
    500 F.3d 1127 (10th Cir. 2007) ............................................................45

*Diné Citizens Against Ruining Our Env't v. Bernhardt,*
    923 F.3d 831 (10th Cir. 2019) ..............................................................17

*EEOC v. PJ Utah, LLC,*
    822 F.3d 536 (10th Cir. 2016) ................................................................1

*El Paso Cnty. v. Trump,*
    982 F.3d 332 (5th Cir. 2020) ................................................................44

*Flute v. United States,*
    808 F.3d 1234 (10th Cir. 2015)............................................................50

*Georgia v. Pennsylvania R. Co.,*
    324 U.S. 439 (1945) ..............................................................................39

*Habecker v. Town of Estes Park*,
518 F.3d 1217 (10th Cir. 2008) ...................................................... 22, 45

*Heckler v. Chaney*,
470 U.S. 821 (1985) .............................................................................. 31

*Kane Cnty. v. United States*,
928 F.3d 877 (10th Cir. 2019) ............................................................. 22

*Massachusetts v. EPA*,
549 U.S. 497 (2007) .............................................................................. 39

*Massachusetts v. Mellon*,
262 U.S. 447 (1923) .......................................................................... 38-40

*Merrion v. Jicarilla Apache Tribe*,
455 U.S. 130 (1982) .......................................................................... 28-29

*Moe v. Confederated Salish & Kootenai Tribes of Flathead Rsrv.*,
425 U.S. 463 (1976) .......................................................................... 36-37

*Murthy v. Missouri*,
603 U.S. 43 (2024) ............................................................................... 45

*National Fitness Holdings, Inc. v. Grand View Corp. Ctr., LLC*,
749 F.3d 1202 (10th Cir. 2014) ........................................................ 26-27

*New Mexico v. Mescalero Apache Tribe*,
462 U.S. 324 (1983) .......................................................................... 28-29

*NLRB v. Pueblo of San Juan,*
   276 F.3d 1186 (10th Cir. 2002) .............................................. 42

*Pennsylvania v. Kleppe,*
   533 F.2d 668 (D.C. Cir. 1976) ........................................ 20, 44

*Prairie Band of Potawatomi Indians v. Pierce,*
   253 F.3d 1234 (10th Cir. 2001) .............................................. 37

*Quapaw Tribe of Okla. v. Blue Tee Corp.,*
   653 F. Supp. 2d 1166 (N.D. Okla. 2009) .............................. 37

*Richison v. Ernest Grp., Inc.,*
   634 F.3d 1123 (10th Cir. 2011) ........................................ 24, 33

*Safe Streets All. v. Hickenlooper,*
   859 F.3d 865 (10th Cir. 2017) ............................................... 49

*Shamloo v. Mississippi State Board of Trustees of Institutes of Higher*
   *Learning,*
   620 F.2d 516 (5th Cir. 1980) ........................................... 26-27

*State v. EPA,*
   989 F.3d 874 (10th Cir. 2021) ............................................... 22

*Summers v. Earth Island Inst.,*
   555 U.S. 488 (2009) ............................................................. 46

*Tandy v. City of Wichita,*
   380 F.3d 1277 (10th Cir. 2004) .............................................. 45

*Tompkins v. Department of Veterans Affs.*,
  16 F.4th 733 (10th Cir. 2021) ........................................................17-18

*United States v. Jicarilla Apache Nation*,
  564 U.S. 162 (2011) ........................................................................49-50

*United States v. Lara*,
  541 U.S. 193 (2004) ............................................................................ 40

*United States v. Walker*,
  918 F.3d 1134 (10th Cir. 2019) ........................................................ 49

*Watkins v. Genesh, Inc.*,
  135 F.4th 1224 (10th Cir. 2025) ....................................................23-24

*Western Watersheds Project v. Interior Bd. of Land Appeals*,
  62 F.4th 1293 (10th Cir. 2023) ........................................................ 22

*WildEarth Guardians v. EPA*,
  759 F.3d 1196 (10th Cir. 2014) ........................................................ 32

*Wyo-Ben Inc. v. Haaland*,
  63 F.4th 857 (10th Cir. 2023) ........................................................17-18

*Wyoming v. Department of Interior*,
  674 F.3d 1220 (10th Cir. 2012)................................................20, 44, 46

**Statutes**

8 U.S.C. 1401(b) ..................................................................................... 39

28 U.S.C. 1331 .......................................................................................... 1

28 U.S.C. 1345 ..................................................................................... 1

28 U.S.C. 1355 ..................................................................................... 1

31 U.S.C. 3302 ..................................................................................... 8

42 U.S.C. 7401 *et seq.* ...................................................................... 1

42 U.S.C. 7413(a)(1)........................................................................... 40

42 U.S.C. 7413(b) ............................................................................... 34

42 U.S.C. 7416 .................................................................................... 41

42 U.S.C. 7601(d)(1)(A) ..................................................................... 32

42 U.S.C. 7601(d)(2)(B) ..................................................................... 32

Treaty between the United States of America and the Tabeguache,
    Muache, Capote, Weeminuche, Yampa, Grand River, and Uintah
    Bands of Ute Indians, 15 Stat. 619, art. IV, VII (Nov. 6, 1868).....41-42

Utah Air Conservation Act, Utah Code Ann. §§ 19-2-101 *et seq.*.............. 1

## Regulations

40 C.F.R. Part 49 ................................................................................ 32

40 C.F.R. 49.3..................................................................................... 41

## STATEMENT OF PRIOR OR RELATED CASES

There have been no prior or related appeals in this case.

## STATEMENT OF JURISDICTION

Plaintiffs-appellees United States of America and State of Utah brought suit against Ovintiv USA Inc., the predecessor-in-interest of defendant-appellee FourPoint Resources, LLC, alleging violations of the Clean Air Act, 42 U.S.C. 7401 *et seq.*, and the Utah Air Conservation Act, Utah Code Ann. 19-2-101 *et seq.* App. Vol. 1 at 40-43.[1] The district court had jurisdiction under 28 U.S.C. 1331, 1345, and 1355. On August 1, 2025, the court denied movant-appellant Ute Indian Tribe of the Uintah and Ouray Reservation's (the Tribe) motion to intervene in this action. App. Vol. 3 at 658-669. The Tribe timely appealed on September 23, 2025. App. Vol. 3 at 670. This Court has jurisdiction under the collateral order doctrine. *See EEOC v. PJ Utah, LLC*, 822 F.3d 536, 539 (10th Cir. 2016).

## STATEMENT OF THE ISSUE

Whether the district court correctly held that the Tribe failed to demonstrate that it had suffered a cognizable injury-in-fact, and therefore, lacked standing to intervene in this action.

---

[1] "App. Vol. __ at __" refers to the volume and page number of appellant's appendix. "Br. __" refers to the page number in appellant's opening brief.

## STATEMENT OF THE CASE

### A.    Factual Background

Ovintiv is an oil and gas exploration and production company that
operates in Utah's Uinta Basin.  App. Vol. 1 at 11-12.  In May 2018, the
Environmental Protection Agency (EPA) contacted individuals at the
Ute Indian Tribe Air Quality Program to coordinate joint inspections of
Ovintiv's oil and gas facilities within the Uintah and Ouray Reservation
(the Reservation).  App. Vol. 1 at 284; App. Vol. 2 at 325-327.  In total,
EPA inspected more than 20 Ovintiv facilities between June 25, 2018,
and August 15, 2019.  App. Vol. 1 at 36-37.  Representatives from the
Ute Indian Tribe Air Quality Program attended five of those
inspections, and representatives from Utah's Division of Air Quality
attended the remaining inspections.  App. Vol. 1 at 36-37.[2]

---

[2] EPA and the State of Utah have distinct roles regarding
Ovintiv's facilities.  As discussed below, EPA is the primary enforcer of
the Clean Air Act on Indian country lands on the Reservation.  As
described above, EPA coordinated its inspections of Ovintiv's Indian
country facilities with the Tribe, and tribal officials accompanied EPA
on the inspections.  EPA has not, however, approved Utah to administer
Clean Air Act programs on Indian country lands in the Reservation.
Accordingly, in this matter, Utah enforced violations only on *non*-Indian
country lands, including violations of Utah law and Clean Air Act
programs that EPA has delegated to the State on non-Indian country
lands.

During these visits, EPA personnel observed storage tanks emitting air pollutants known as volatile organic compounds directly into the atmosphere. App. Vol. 1 at 37-39, 280. Inspectors also saw evidence that multiple combustors—emissions control devices designed to burn and destroy volatile organic compounds—were not operating. App. Vol. 1 at 15, 38-39, 280.

Because these and other observations provided evidence that Ovintiv's facilities were out of compliance with the Clean Air Act, the Utah Air Conservation Act, and regulations implementing the two statutes (App. Vol. 1 at 40-51), EPA sent Ovintiv a notice via email on July 15, 2020, identifying violations that had been found during the 2018 inspections (App. Vol. 1 at 284). EPA included the Ute Indian Tribe Business Committee, the governing body of the Tribe, on its transmission of the email. App. Vol. 1 at 284; App. Vol. 2 at 329. Later that year, EPA, the Department of Justice, the Utah Division of Air Quality, and the Utah Attorney General's Office initiated negotiations with Ovintiv to try to resolve the violations. App. Vol. 1 at 280.

In February 2021, the Ute Indian Tribe Business Committee sent EPA a letter requesting "formal consultation" on all Clean Air Act

enforcement actions in the Uinta Basin being pursued by the agency. App. Vol. 2 at 330-332. The Committee also proposed a joint "Memorandum of Understanding" that would address how such enforcement actions would be handled in the future, including processes for considering "Tribal interests" during such actions. App. Vol. 2 at 330. EPA responded and expressed its commitment to "meaningful consultation" with the Tribe and "coordination on environmental matters that may affect the Tribe's interests." App. Vol. 2 at 334. EPA also offered to "schedule [a] consultation" with Committee staff to discuss the agency's enforcement work and "the Tribe's interests related to this work." App. Vol. 2 at 333. Regarding the Ovintiv enforcement matter specifically, EPA explained that compliance with Clean Air Act requirements was "particularly important" in "the Uinta Basin where there are concerns for elevated ozone levels" and additional "emissions from oil and natural gas operations [would] contribute to the formation of ground-level ozone." App. Vol. 2 at 333.[3]

---

[3] EPA and the Tribe eventually entered into a Memorandum of Agreement (MOA) on April 12, 2023. App. Vol. 2 at 319. The MOA memorializes the parties' "commitment to effective and appropriate coordination and communication when the EPA conducts civil

Prior to the scheduled consultation meeting between EPA and Ute Indian Tribe Business Committee staff, counsel for the Tribe asked to attend a settlement negotiation between EPA, the Department of Justice, Utah, and Ovintiv.  App. Vol. 1 at 285; App. Vol. 2 at 343.  EPA responded and explained that tribal attendance at the settlement meeting would not be possible because the Tribe was not a party to the enforcement action, and thus, its presence would contravene an EPA policy that bars communications with third parties about enforcement actions when doing so would disclose confidential settlement information.  App. Vol. 1 at 285; *see* App. Vol. 2 at 344.  EPA also explained that the enforcement action had been referred to the Department of Justice, and the Department does not consult with tribes on matters in active settlement negotiations.  App. Vol. 1 at 285; App. Vol. 2 at 344.

Subsequent communications between EPA and tribal counsel discussed the possibility of the Tribe becoming a party to EPA's

---

compliance monitoring activities" on the Reservation, but "does not[] create any right or benefit, substantive or procedural, enforceable at law or in equity against either of the Parties."  App. Vol. 2 at 316-319.

negotiations with Ovintiv.  App. Vol. 2 at 345.  As EPA explained, the Tribe would need "an independent basis to seek judicial relief" against Ovintiv that related to the federal and state claims being discussed by EPA and Utah, and one possibility could be the assertion of a claim under "tribal . . . environmental laws."  App. Vol. 2 at 345.  EPA also offered to discuss this topic further at the "upcoming consultation" between EPA and the Tribe.  App. Vol. 2 at 345-346.

On October 6, 2021, EPA held a virtual government-to-government consultation meeting with the Tribe to discuss ongoing Clean Air Act enforcement actions on the Reservation, including the action against Ovintiv, and solicited tribal input on those actions.  App. Vol. 1 at 286.  Then, in December 2022, EPA met with the Tribe's Air Program Coordinator and provided information about ongoing enforcement actions on the Reservation.  App. Vol. 1 at 286.  After that meeting, EPA contacted tribal counsel and asked to set up recurring meetings so that EPA could "more frequently check in [with the Tribe] about the general status of ongoing EPA enforcement cases" on the Reservation.  App. Vol. 1 at 286-287; App. Vol. 2 at 349.

On March 14, 2023, EPA apprised the Tribe of "proposed civil judicial enforcement actions" involving Ovintiv's facilities within the Reservation.  App. Vol. 2 at 350-351.  EPA also informed the Tribe that it was engaged in settlement discussions with Ovintiv to resolve the company's Clean Air Act violations.  App. Vol. 2 at 350.  EPA explained that when a facility operating in violation of federal law is neither owned, managed, nor controlled by a tribal government, EPA typically "address[es] the noncompliance by initiating formal enforcement while keeping the tribal government informed of its efforts and progress"—a practice that has proven to be "the fastest way to return a facility to compliance."  App. Vol. 2 at 350.  EPA thus asked the Tribe to send the agency any information the Tribe wanted it to consider; let EPA know if the Tribe wanted "to consult with [EPA] on th[e] matter"; and identify any "potential remedies" the Tribe wanted EPA to discuss with Ovintiv.  App. Vol. 2 at 351.  The next day, EPA followed up with the Tribe's Air Program Coordinator, asking whether he was interested in "meet[ing] and discuss[ing] further."  App. Vol. 2 at 352.

The Tribe responded by letter a month later, stating, "We do not want consultation.  We want direct engagement in any future

- 7 -

negotiations." App. Vol. 2 at 353-354. The Tribe also asserted "an

interest in receiving a benefit from negotiations reached with [Ovintiv]

. . . to offset any realized loss of value stemming from diminished

industry operations." App. Vol. 2 at 354.

In response to the Tribe's letter, EPA took several actions. A week

after receiving the letter, EPA counsel called tribal counsel and offered

to set up quarterly meetings between EPA and the Tribe's Air Quality

Department to discuss the Ovintiv matter. App. Vol. 1 at 287. Then in

May 2023, EPA staff met with tribal counsel and "again addressed how

the Tribe could bring an independent action against Ovintiv and

become a party [to] ongoing enforcement actions." App. Vol. 1 at 287.

EPA also explained that under the Miscellaneous Receipts Act, 31

U.S.C. 3302, funds payable to the United States generally must be paid

into the United States Treasury unless a state, local, or tribal

government can assert an independent claim under federal, state, or

tribal law that supports its entitlement to civil penalties. App. Vol. 1 at

288; *see also* App. Vol. 2 at 357-358. Additionally, EPA discussed with

the Tribe various injunctive remedies that the agency had obtained

through settlements in recent oil and gas-storage-tank cases, and it

later sent copies of the consent decrees in those cases to the Tribe via email.  App. Vol. 2 at 360.

The following year, in September 2024, EPA wrote to the Ute Indian Tribe Business Committee and provided an update on the Ovintiv action.  EPA recounted its prior communications with the Tribe about Ovintiv in March and May 2023.  App. Vol. 2 at 363.  And EPA apprised the Committee that a settlement with Ovintiv likely would be finalized soon.  App. Vol. 2 at 363.  EPA also told the Committee that it would send the tribal chairman a copy of the parties' consent decree after it was filed and offered to set up a meeting between EPA, Ovintiv, and the Committee afterwards to "go over the terms of settlement . . . and answer any questions the Committee may have."  App. Vol. 2 at 363.

### B.    Procedural Background

On September 30, 2024, the United States and Utah filed suit against Ovintiv.  App. Vol. 1 at 9-52.  The complaint alleged that Ovintiv's emissions of volatile organic compounds from storage vessels and vapor control systems at the company's facilities in the Uinta Basin violated the Clean Air Act and the Utah Air Conservation Act.  App.

Vol. 1 at 10, 40-51.  The United States and Utah also sought civil penalties under those statutes.  App. Vol. 1 at 40-51.

Concurrently, the United States and Utah lodged a proposed consent decree to resolve their claims.  App. Vol. 1 at 53-155.  The decree would require Ovintiv to take a variety of actions to ensure that its facilities, including many within the Reservation, comply with the Clean Air Act and (for facilities not on Indian country land) the Utah Air Conservation Act.  App. Vol. 1 at 70-108.  It would also require Ovintiv to pay a $5.5 million civil penalty, to be divided evenly between the United States and Utah.  App. Vol. 1 at 108-110.

The following day, on October 1, 2024, EPA wrote to the Tribe's chairman, informed him of the United States and Utah's suit against Ovintiv, provided a copy of the proposed consent decree, and invited the Tribe to comment on the proposed settlement.  App. Vol. 2 at 364-365. The United States and Utah also gave notice of the proposed consent decree through publication in the Federal Register and solicited public comment.  App. Vol. 3 at 659.  The Tribe submitted the only comment on the proposed decree.  *See* App. Vol. 3 at 659.  In its comment, the Tribe expressed opposition to entry of the decree on the ground that

EPA allegedly had been "unwilling[] . . . to engage in consultation with the Tribe" regarding the enforcement action against Ovintiv.  App. Vol. 1 at 276-277.

The United States and Utah filed an unopposed motion for entry of the consent decree on December 23, 2024.  App. Vol. 1 at 156-172.  In the motion, the United States and Utah responded to the Tribe's comment and explained that although "EPA did not have a legal obligation to consult with the Tribe following referral of the matter to the U.S. Department of Justice," the agency nonetheless "consult[ed] and coordinate[d] with the Tribe" prior to lodging the proposed decree. App. Vol. 2 at 512; *see also* App. Vol. 2 at 512-513 (summarizing EPA's engagement with the Tribe).  The district court reviewed the parties' proposed decree, found it to be "fair, reasonable, adequate, and lawful," granted the United States and Utah's motion, and entered the decree as a final judgment.  App. Vol. 2 at 369-370.  The clerk of the court then closed the case.  App. Vol. 1 at 4.[4]

---

[4] Shortly after the district court entered the consent decree, FourPoint Resources, Inc. acquired all of Ovintiv's assets that were subject to the decree.  App. Vol. 3 at 660 n.14.  Accordingly, the court

A week later, the Tribe filed a motion to intervene. App. Vol. 2 at 470-480. As set forth in the Tribe's memorandum and proposed motion under Federal Rule of Civil Procedure 60(b), the Tribe sought intervention as of right and permissive intervention "for the purpose of obtaining relief from final judgment" under Rule 60(b). App. Vol. 2 at 470-471, 486. This would entail "[s]et[ting] aside" the consent decree until EPA "meaningfully consult[ed] with the Tribe" and allowed it to "provide input or otherwise engage in the Consent Decree negotiation process." App. Vol. 2 at 502-503.

Because the Tribe's pleading sought "relief 'different from that which [was] sought' by any party in the litigation," the district court directed the parties to submit supplemental briefing on whether the Tribe had established injury-in-fact and redressability for purposes of standing. App. Vol. 3 at 661 (citation omitted); *see also* App. Vol. 2 at 537-538 (briefing order). In its supplemental brief, EPA proffered numerous arguments why the Tribe had failed to identify any cognizable injury-in-fact—among those arguments, EPA explained that

---

substituted FourPoint for Ovintiv as the defendant in the decree. App. Vol. 3 at 549.

it had repeatedly "consult[ed] with the Tribe about the planned action against Ovintiv." App. Vol. 3 at 612. Following briefing, the court issued an order denying the Tribe's intervention motion because it had not suffered any injury-in-fact. App. Vol. 3 at 661.

The district court first addressed the Tribe's argument that EPA had violated the MOA "by failing to engage in government-to-government consultations with the Tribe related to the enforcement action against [Ovintiv]." App. Vol. 3 at 662. As the court explained, the Tribe's arguments based on the MOA "ha[d] evolved since the Tribe initially sought intervention." App. Vol. 3 at 663 n.34. But regardless, the court rejected the notion that an alleged violation of the MOA could constitute a viable injury-in-fact under Article III. As the court explained, the MOA "explicitly and unambiguously disclaims the creation of any substantive or procedural rights," and there were "no sufficiently 'concrete interest[s]' threatened by the EPA's alleged violation of the [MOA]." App. Vol. 3 at 663.

Next, the district court turned to the Tribe's contention that EPA had "invaded" its "sovereign authority." App. Vol. 3 at 664. The court declined to find standing on this basis because the cases on which the

Tribe relied "involve[d] the sovereign interests of States, not Indian tribes." App. Vol. 3 at 665. Moreover, even assuming that those cases applied to tribes, the harm alleged here—a purported "failure 'to allow the Tribe to . . . provide input on the Tribe's duly adopted priorities and objectives'"—was "different in kind from the sovereign interests" discussed in the Tribe's cases. App. Vol. 3 at 665.

As for the Tribe's invocation of its quasi-sovereign interest as *parens patriae* in "upholding, protecting, and advancing the interests of its citizens," the district court rejected this argument because, as above, the Tribe relied on case law involving states, and not Indian tribes. App. Vol. 3 at 666. Even assuming those cases applied to tribes, the court concluded that their logic foreclosed the Tribe from establishing standing. The cases hold that states cannot challenge federal action on a *parens patriae* theory of standing, and the court found these holdings "dispositive" regarding the Tribe's effort to bring suit as *parens patriae*. App. Vol. 3 at 666. In its briefing in the district court, the Tribe had sought to distinguish Indian tribes from states, arguing that "the Supremacy Clause and principles of federalism" do not mandate such a

result for Indian tribes seeking to litigate as *parens patriae*, but the court found this distinction "questionable."  App. Vol. 3 at 666-667.

Alternatively, the district court rejected the Tribe's invocation of its quasi-sovereign interests because "EPA is the primary enforcer" of the Clean Air Act on the Reservation.  App. Vol. 3 at 667.  The court explained that the Clean Air Act allows, and EPA's regulations provide a process for, tribal enforcement of the statute in areas under tribal jurisdiction.  App. Vol. 3 at 667.  However, here, the Tribe "ha[d] not yet sought or obtained status to enforce the [Clean Air Act] on the Reservation, so the EPA is entitled to enforce [the statute] there, not the Tribe."  App. Vol. 3 at 667.  Accordingly, EPA's enforcement of the statute against Ovintiv inflicted no injury on the Tribe's quasi-sovereign interests.  *See* App. Vol. 3 at 667.

The district court also held that the Tribe had not established standing based on alleged economic harms.  The Tribe had cited the consent decree's failure to provide any "meaningful benefit" to the Tribe "from the fees and [civil] penalties" imposed.  App. Vol. 3 at 667.  The court rejected this as a basis for finding an economic injury-in-fact, reasoning that because the Tribe lacks any legal claim to the Clean Air

Act penalties assessed against Ovintiv, the Tribe also lacks any entitlement to a "'meaningful benefit' from those very same penalties." App. Vol. 3 at 668.  The Tribe had also cited a potential loss of revenue from "industry partners" engaged in "on-Reservation oil and gas production" following entry of the consent decree.  App. Vol. 3 at 667-668.  But the court explained that this allegation of harm was contingent on how third parties responded to EPA's regulation of "someone else"—namely, Ovintiv—which made standing "substantially more difficult to establish."  App. Vol. 3 at 669 (citation omitted).  And here, the Tribe's allegations and arguments about economic harm were insufficient to satisfy this "heightened showing."  App. Vol. 3 at 669.

The district court also held that the Tribe had waived certain arguments by failing to develop them, or by attempting to raise them for the first time in the Tribe's reply brief.  These arguments included assertions that (1) the sovereign interests giving rise to the Tribe's injury-in-fact were "not limited to" the "power to create and enforce a legal code" and "the demand for recognition from other sovereigns"; (2) the United States had "disregard[ed] duly adopted Tribal law" because the Ute Indian Tribe Business Committee had "adopted the [MOA] into

binding tribal law"; and (3) the United States had "failed to 'uphold its trust responsibility' by not engaging in consultations with the Tribe." App. Vol. 3 at 662 n.30, 664, 665 n.45, 665 n.48. Even if these arguments had not been waived, the court found that each one failed on its own merits. *See* App. Vol. 3 at 662 n.30, 665 n.45, 665 n.48.

Accordingly, the district court held that the Tribe had failed to demonstrate injury-in-fact, and it denied the motion to intervene based on the Tribe's inability to establish standing. App. Vol. 3 at 669. The Tribe timely appealed. App. Vol. 3 at 670.

## STANDARD OF REVIEW

This Court reviews de novo the district court's determination that the Tribe failed to demonstrate standing. *See Diné Citizens Against Ruining Our Env't v. Bernhardt*, 923 F.3d 831, 840 (10th Cir. 2019). However, arguments not properly presented to the district court warrant reversal only if they satisfy plain-error review. *Tompkins v. Department of Veterans Affs.*, 16 F.4th 733, 735 n.1 (10th Cir. 2021); *see also Wyo-Ben Inc. v. Haaland*, 63 F.4th 857, 871 (10th Cir. 2023). Where a party waived an argument below and does not argue in this Court that "the district court plainly erred in failing to raise [that]

issue[]," the argument is also "waived" on appeal. *Tompkins*, 16 F.4th at 735 n.1; *see also Wyo-Ben*, 63 F.4th at 871.

## SUMMARY OF ARGUMENT

The Court should affirm the district court's ruling that the Tribe lacked standing to intervene in this action because it identified no cognizable injury-in-fact. There are many bases on which this Court can affirm, and chief among them is the fact that the Tribe suffered no injury because EPA provided the consultation that the Tribe claims to have been deprived. As the record below makes clear, EPA communicated regularly with the Tribe regarding the enforcement action against Ovintiv—providing numerous updates, answering the Tribe's questions, and inviting input from the Tribe regarding (among other things) potential remedies that the agency should consider in any settlement with Ovintiv. The Court can and should affirm on this narrow, factual ground.

Even if the Court chooses to address the Tribe's contentions about alleged injuries to its sovereign, quasi-sovereign, and economic interests, the Court should reject these arguments as meritless. The Tribe cannot show that either of the two sovereign interests on which it

relies—power over individuals and entities on the Reservation, and

recognition from other sovereigns—encompasses a right to consultation

regarding Clean Air Act enforcement on the Reservation.  Nor was

either of those sovereign interests infringed here.  Because EPA (and

not the Tribe) is authorized to enforce the Clean Air Act on the

Reservation, the agency's enforcement action against Ovintiv did not

intrude on the Tribe's power to regulate conduct by individuals and

entities on the Reservation.  As for the Tribe's contention that EPA

failed to comply with the MOA, thereby ignoring tribal law and

disregarding the Tribe's sovereignty, the Tribe waived this argument

below and again on appeal.  But regardless, the Tribe cannot show that

the district court plainly erred by failing to find an injury to the Tribe's

sovereign interests on this basis.

Likewise, the Tribe demonstrates no injury to its quasi-sovereign

interests.  For decades, the Supreme Court has made clear that states

cannot sue as *parens patriae* and challenge the federal government's

enforcement of federal law.  The logic underlying this holding applies

equally to Indian tribes and bars the Tribe's effort to sue as *parens*

*patriae* here.  Even if Indian tribes were situated differently than states

in the context of *parens patriae* standing, the Tribe's reliance on its quasi-sovereign interests still fails because EPA's enforcement of the Clean Air Act did not impair those interests. Congress exercised its plenary authority to make EPA the primary enforcer of the Clean Air Act on the Reservation. Consequently, EPA (and not the Tribe) is entitled to make judgment calls about the remedies that will appropriately resolve Clean Air Act violations, including for the benefit of individuals residing on the Reservation. The Tribe identifies no legal authority mandating that it be consulted about such enforcement decisions or have the power to exclude potential remedies that, in its view, do not sufficiently advance tribal priorities.

Nor has the Tribe shown that it suffered any economic harm. To show injury-in-fact based on an alleged loss of tribal revenue from oil and gas production royalties and taxes, the Tribe must establish a "fairly direct link" between the diminishment in revenue and the government action being challenged. *Wyoming v. Department of Interior*, 674 F.3d 1220, 1234 (10th Cir. 2012) (quoting *Pennsylvania v. Kleppe*, 533 F.2d 668, 672 (D.C. Cir. 1976)). The Tribe cannot make such a showing here because its arguments about diminished revenue

rely on speculation about how oil and gas producers will respond to EPA's settlement with Ovintiv. The Tribe's arguments about the "lack of any guaranteed return to the Tribe" under the consent decree (Br. 24) also fall flat: the Tribe offers no persuasive reasons why its *lack* of a direct financial stake in EPA's settlement with Ovintiv should trigger an obligation for EPA to consult with the Tribe regarding settlement terms.

Finally, the Tribe's brief allusion to the United States' trust responsibility provides no basis for reversal. The Tribe waived this argument below, and it has waived the argument again on appeal. But regardless, the argument fails on its merits because the Tribe identifies no treaty, statute, or regulation that required EPA to consult with the Tribe regarding the Ovintiv enforcement action.

## ARGUMENT

**The district court correctly held that the Tribe failed to identify any cognizable injury-in-fact, and therefore, could not establish standing to challenge entry of the parties' consent decree.**

### A.    Intervention and Standing Requirements

A non-party to a case may seek intervention as of right and permissive intervention under Federal Rule of Civil Procedure 24(a)(2) and (b), respectfully. When a prospective intervenor as of right seeks

different relief than that sought by the parties to the action, the prospective intervenor must satisfy the requirements for Article III standing. *See Kane Cnty. v. United States*, 928 F.3d 877, 886 (10th Cir. 2019). This requires the prospective intervenor to show that it has "suffered an injury in fact that is concrete, particularized, and actual or imminent," "the injury was likely caused by the defendant," and "the injury would likely be redressed by judicial relief." *Western Watersheds Project v. Interior Bd. of Land Appeals*, 62 F.4th 1293, 1296-1297 (10th Cir. 2023) (citation omitted). When "'the independent action of some third party not before the court' . . . [is] the direct cause of the [intervenor's purported] harm," standing is "substantially more difficult" to establish." *Habecker v. Town of Estes Park*, 518 F.3d 1217, 1225 (10th Cir. 2008) (citations omitted; alterations added); *see also State v. EPA*, 989 F.3d 874, 889 (10th Cir. 2021).

The prospective intervenor bears the burden of establishing standing. *See Western Watersheds Project*, 62 F.4th at 1296. At the pleading stage, the prospective intervenor must "'clearly allege facts demonstrating each element' of standing." *Citizens for Const. Integrity*

*v. United States*, 57 F.4th 750, 759 (10th Cir.) (citation omitted), *cert.*

*denied*, 144 S. Ct. 94 (2023).

### B.    The Tribe suffered no injury-in-fact because EPA provided the consultation that the Tribe claims it failed to receive.

The Tribe asks this Court to reverse the decision below and hold

that it sufficiently alleged "a direct and concrete injury to its sovereign

interests, its quasi-sovereign interests, and its economic interests."  Br.

11.  Each of these injuries is predicated on EPA's supposed failure to

consult with the Tribe prior to entry of the parties' consent decree.  *See*

Br. 16 (asserting a violation of the Tribe's sovereign interests based on

EPA's "failure to engage[] [or] consult with" the Tribe"), 20 (same for

quasi-sovereign interests based on EPA's lack of "engage[ment] with the

Tribe"), 24-25 (same for economic interests based on the Tribe's need to

"hav[e] a voice in the" enforcement process).

The Court should reject these arguments, however, because EPA

repeatedly engaged and consulted with the Tribe about its enforcement

action against Ovintiv before filing suit and moving for entry of the

consent decree.  This Court may affirm the decision below "on any basis

supported by the record, even if it requires ruling on arguments not

reached by the district court," as would be the case here. *Watkins v. Genesh, Inc.*, 135 F.4th 1224, 1229 (10th Cir. 2025) (citation omitted). This Court's "read[iness] to affirm whenever the record allows it" flows from recognition of "the cost and risk involved anytime [an appellate court] upset[s] a [district] court's reasoned judgment." *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1130 (10th Cir. 2011); *see also ibid.* (noting a "preference for affirmance" and "reluctance to command do-overs in the district court"). Here, the Court need not decide whether the Tribe suffered any injury to its sovereign, quasi-sovereign, or economic interests because the record makes clear that, in fact, the Tribe received the consultation of which it claims to have been deprived.

As recounted above, EPA regularly communicated with, and provided updates to, the Tribe as it negotiated a settlement to resolve Ovintiv's violations of the Clean Air Act on the Reservation. The enforcement action itself was precipitated by a series of inspections of Ovintiv's facilities during which members of the Ute Indian Tribe Air Quality Program were present. *See* pp. 2-3, *supra.* After EPA determined that many of those facilities were out of compliance with the Clean Air Act, EPA copied the Ute Indian Tribe Business Committee on

the Notice of Violation it sent to Ovintiv.  *See* p. 3, *supra*.  Over the next two years, EPA met with tribal representatives and delivered updates on the Ovintiv action on multiple occasions.  *See* pp. 4-6, *supra*.  EPA even discussed with tribal counsel the possibility of the Tribe becoming a party to the negotiations with Ovintiv if it could assert an independent claim under tribal environmental laws.  *See* pp. 5-6, *supra*.

In March 2023, EPA formally notified the Tribe of a proposed civil enforcement action against Ovintiv.  *See* p. 7, *supra*.  EPA also invited the Tribe to (1) send the agency any information the Tribe wanted it to consider; (2) identify any specific remedies the Tribe wanted EPA to discuss with Ovintiv; and (3) "consult with the EPA on th[e] matter." App. Vol. 2 at 350-351.  After the Tribe responded with a letter requesting "direct engagement in any future negotiations" (App. Vol. 2 at 354), EPA reiterated that the Tribe could become a party to the enforcement action by bringing an independent claim against Ovintiv (*see* p. 8, *supra*).  EPA also offered to set up quarterly meetings with the Tribe's Air Quality Department and discussed with tribal counsel different types of injunctive relief that the agency had obtained in similar enforcement matters that were resolved via settlement.  *See* p.

8, *supra*.  The following year, EPA apprised the Tribe that a settlement with Ovintiv was forthcoming and proposed a meeting between the agency, the Tribe, and Ovintiv to "go over the terms of settlement . . . and answer any questions the Committee may have."  App. Vol. 2 at 363.

As this summary makes clear, EPA repeatedly "consult[ed] with, involve[d], [and] obtain[ed] input from the Tribe" following the agency's initial identification of Clean Air Act violations and through its lodging of a proposed consent decree to resolve those violations—just as the Tribe had requested in the district court.  App. Vol. 3 at 560.  The Tribe cannot therefore rely on an alleged *lack* of consultation by the agency as an injury-in-fact to support its standing to intervene and demand to have the consent decree be set aside.  To the contrary, the Tribe received the consultation that it errantly suggests had been lacking.  This Court can and should affirm the decision below on this narrow, straightforward ground.  *See National Fitness Holdings, Inc. v. Grand View Corp. Ctr., LLC*, 749 F.3d 1202, 1208 (10th Cir. 2014) (citing *Shamloo v. Mississippi State Board of Trustees of Institutes of Higher*

*Learning*, 620 F.2d 516 (5th Cir. 1980), for the proposition that "[c]ases are to be decided on the narrowest legal grounds available").

### C. The Tribe fails to demonstrate that it suffered any injury to its sovereign interests.

If the Court reaches the Tribe's broader merits arguments, it should similarly hold that they fail to show that the Tribe suffered any cognizable injury-in-fact.

1. The Tribe argues that, contrary to what the district court concluded, it sufficiently pleaded an injury-in-fact based on "intrusion[s] upon [the Tribe's] sovereign interests."  Br. 15.  Quoting the Supreme Court's decision in *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592 (1982), the Tribe identifies two sovereign interests that EPA allegedly violated:  (1) the ability to exercise "sovereign power over individuals and entities within the relevant jurisdiction," which typically involves "the power to create and enforce a legal code"; and (2) "the demand for recognition from other sovereigns," which "most frequently" involves "the maintenance and recognition of borders."  Br. 15 (quoting *Alfred L. Snapp*, 458 U.S. at 601); *see also* Br. 16 (referring to the Tribe's "right to exercise its inherent authority as a sovereign"

and "receive due recognition" from the United States and federal agencies).

This argument fails at its premise because the Tribe cannot demonstrate that either of these sovereign interests specifically includes a right to consultation regarding Clean Air Act enforcement. *See also* App. Vol. 3 at 665 n.48 (holding that the Tribe waived any argument that "its sovereign interests are not limited to the two interests" described above). The Tribe cites no case law or other authority that elaborates on these sovereign interests and locates within them an interest in consultation.

This dearth of legal support is unsurprising because, as the district court correctly observed, the Tribe's asserted interest in consultation is categorically "different in kind from the sovereign interests delineated in" the cases on which the Tribe relies. App. Vol. 3 at 665. For example, the Tribe cites *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324 (1983), and *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130 (1982). *See* Br. 18. But as the Tribe recognizes (Br. 18), the sovereign rights at issue in those cases fall squarely within the "sovereign power over individuals and entities within the relevant

jurisdiction" discussed in *Alfred L. Snapp*.  *New Mexico* analyzed a tribe's "comprehensive scheme for managing [a] reservation's fish and wildlife resources," which had been established with "extensive federal assistance and supervision," and the Court held that state regulations conflicting with the scheme were preempted.  462 U.S. at 325.  As for *Merrion*, the Court concluded in that case that a tribe's "authority to tax non-Indians who conduct business on [its] reservation" is "an inherent power necessary to tribal self-government and territorial management." 455 U.S. at 141.  Both cases implicated tribal "power to create and enforce a legal code," *Alfred L. Snapp*, 458 U.S. at 601, and neither involved a purported sovereign interest in being consulted prior to a federal agency's enforcement of a federal statute on a tribe's reservation.

The breadth of the Tribe's argument regarding sovereign interests makes its lack of legal support all the more conspicuous.  The Tribe contends that EPA's alleged failure to consult regarding the Ovintiv matter effectively "preclud[ed] the Tribe from participating in the management and oversight of activities taking place within its territorial jurisdiction" and thereby "intruded upon the Tribe's

- 29 -

sovereign interests." Br. 18. Nothing about this argument is limited to the Clean Air Act context. To the contrary, the Tribe's logic would find a cognizable injury-in-fact *any time* the federal government enforced federal law on an Indian reservation without consulting with the tribe beforehand. Despite the numerous statutory schemes and potential enforcement contexts in which this could occur, the Tribe identifies no case law holding that such action "intrude[s]" on a tribe's sovereign interests and qualifies as a viable injury-in-fact for standing purposes. Br. 18.

2. Lacking support for its broader legal propositions, the Tribe suggests that EPA "disregarded the role of the Tribe as a sovereign landowner" and its "regulatory authority" over activities on the Reservation. Br. 16. This assertion fails in light of the Tribe's acknowledgment elsewhere in its brief that responsibility for enforcing the Clean Air Act on Indian country lands within the Reservation lies with EPA. *See* Br. 20 (recognizing that the Tribe's "sovereign prerogative does not divest EPA of its [Clean Air Act] enforcement authority on Tribal lands").

EPA fulfilled this role by bringing an enforcement action against Ovintiv and negotiating a consent decree to remedy the company's violations of the statute. EPA sent the Tribe a letter explaining why the enforcement action advances the Clean Air Act's goals and helps protect the health of tribal members—specifically, EPA had harbored preexisting "concerns [about] elevated ozone levels" in the Uinta Basin, and additional emissions from Ovintiv's facilities would "contribute" further to "the formation of ground-level ozone." App. Vol. 2 at 333. EPA permissibly sought to resolve these concerns via a consent decree designed to achieve "emissions reductions and benefit the public" by, among other things, imposing requirements for the design, operation, and maintenance of Ovintiv's vapor control systems. App. Vol. 1 at 166-167. The selection of these and other provisions to remedy violations of federal law represented a permissible exercise of EPA's enforcement discretion under the Clean Air Act. *Cf. Heckler v. Chaney*, 470 U.S. 821, 831-832 (1985) (discussing agencies' "absolute discretion" regarding whether to bring an enforcement action and summarizing relevant decisionmaking factors, which fall "particularly within [an agency's] expertise").

If the Tribe wishes to take a more direct role in the Clean Air Act's enforcement on the Reservation, the statute provides a path for doing so. Specifically, the Clean Air Act permits, and EPA's Tribal Authority Rule provides a process for, tribes to be treated "as States" under the statute and provide a plan for "the management and protection of air resources within the exterior boundaries of [their] reservation or other areas within [their] jurisdiction." 42 U.S.C. 7601(d)(1)(A), (2)(B); *see also* 40 C.F.R. Part 49; *WildEarth Guardians v. EPA*, 759 F.3d 1196, 1199-1200 (10th Cir. 2014) (recounting the history of the Tribal Authority Rule). However, the Tribe "has not yet sought or obtained status to enforce the" Clean Air Act on the Reservation under the Tribal Authority Rule. App. Vol. 3 at 667; *see also* App. Vol. 1 at 281. Consequently, EPA remains "the primary enforcer of the [Clean Air Act]" on the Reservation. App. Vol. 3 at 667 (citation omitted). The Tribe offers no argument and cites no case law explaining why administration of the Clean Air Act by the statute's "primary enforcer" infringes on the Tribe's sovereign "regulatory authority." Br. 16. Indeed, such enforcement is particularly unproblematic here where the Tribe has so far declined to pursue available authority to enforce the

Clean Air Act under the Tribal Authority Rule and enable the Tribe's direct participation in the statute's enforcement.

3.  The Tribe also argues that EPA violated its sovereign interest in "recognition from other sovereigns," *Alfred L. Snapp*, 458 U.S. at 601, by "ignor[ing] the protocols set forth in the MOA" (Br. 18).  Because the Tribe "approved and adopted the MOA," it asserts that EPA effectively disregarded "duly enacted Tribal law" by allegedly failing to abide by the MOA.  Br. 18-19.

This argument fails for multiple reasons.  First, the argument is waived on appeal because the Tribe failed to properly raise it below (*see* App. Vol. 3 at 665 n.45), and the Tribe does not argue in its opening brief that the district court plainly erred by failing to adopt this reasoning, *see* pp. 17-18, *supra*.  Second, even if the argument were not waived, the Tribe cannot establish "(1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Richison*, 634 F.3d at 1128.  The court explained in its opinion below that "the Tribe cannot unilaterally enforce an unenforceable document (the [MOA]) against the United States by simply enacting a tribal ordinance."  App.

Vol. 3 at 665 n.45; *see also* App. Vol. 3 at 665 n.45 (explaining that

"[t]he Tribe may not enforce tribal law against the United States").  The

Tribe does not respond to the court's legal reasoning or explain why it is

plainly erroneous.

Even if the MOA were somehow binding on the United States, it

would not govern the Ovintiv enforcement action.  The MOA states that

"EPA will consult with the Tribe *prior to* a decision to refer a civil

enforcement case involving violations in Indian country on the . . .

Reservation to the Department of Justice."  App. Vol. 2 at 318

(emphasis added).  Here, EPA referred the Ovintiv matter to the

Department of Justice in 2020—more than two years before EPA and

the Tribe executed the MOA.  *See* App. Vol. 1 at 280; App. Vol. 2 at 319.

Moreover, as the district court noted below, the MOA's language about

considering and prioritizing the Tribe's preferred remedies "refers only

to 'civil *administrative* enforcement action[s].'"  App. Vol. 3 at 662 n.30

(emphasis and alteration in original); *see also* App. Vol. 2 at 656.  At

issue here, however, is EPA's enforcement of the Clean Air Act through

"[c]ivil *judicial* enforcement" and entry of a consent decree.  42 U.S.C.

7413(b) (alteration and emphasis added).

4.  The Tribe's final argument—that the district court wrongly held that "the sovereign interests articulated by the Supreme Court in *Alfred L. Snapp* . . . apply *only* to states" (Br. 16 (emphasis added))—mischaracterizes the court's opinion and thus similarly lacks merit. Read in context, the opinion is better understood as expressing skepticism that the sovereign interests of states, as described in *Alfred L. Snapp*, are coextensive with the sovereign interests of tribes.

As plaintiffs stated in their briefing below, *Alfred L. Snapp* "articulated two sovereign interests":  the power to create and enforce a legal code, and to demand recognition from other sovereigns.  App. Vol. 3 at 664 (citation omitted).  The Tribe acknowledged that *Alfred L. Snapp* "concern[ed] the sovereign interests of States" and not Indian tribes.  App. Vol. 3 at 664.  However, it argued that Indian tribes possess "sovereign authority not derived from the United States, which they predate."  App. Vol. 3 at 664.

Given *Alfred L. Snapp*'s narrow identification of two state sovereign interests, and given the Tribe's argument to the district court that the source of tribal sovereign interests differs from that of states, the court reasonably rejected the Tribe's reliance on *Alfred L. Snapp* as

"involv[ing] the sovereign interests of States, not Indian tribes."  App.
Vol. 3 at 665.  In the alternative, however, the court "assum[ed]" that
*Alfred L. Snapp*'s descriptions of state sovereign interests and the scope
of those interests could be transplanted wholesale to the tribal context.
App. Vol. 3 at 665.  And the court concluded that the Tribe's asserted
sovereign interest in consultation was "different in kind from the
sovereign interests delineated in *Alfred L. Snapp*."  App. Vol. 3 at 665.

The portion of the Tribe's brief responding to this aspect of the
lower court's opinion fails to cite any language in *Alfred L. Snapp*
holding that, contrary to what the court found, sovereign interests
encompass a right to consultation.  Rather, the Tribe relies on *New
Mexico* and *Merrion* (*see* Br. 18), and as explained above, those cases do
not aid the Tribe's cause, *see* pp. 28-29, *supra*.  The same is true of the
cases the Tribe cites regarding its "standing to sue to protect its
sovereign right to self-government."  Br. 17.  None of those cases
recognizes a sovereign interest in consultation about enforcement of
federal law on an Indian reservation.  *See Moe v. Confederated Salish &
Kootenai Tribes of Flathead Rsrv.*, 425 U.S. 463, 465 (1976) (considering
application of state tax and licensing laws to tribal members on a

reservation, including in the context of transactions with non-tribal members); *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1237 (10th Cir. 2001) (considering application of state motor vehicle registration and titling laws to vehicles owned by tribal members and registered and titled under the tribe's motor vehicle code); *Quapaw Tribe of Okla. v. Blue Tee Corp.*, 653 F. Supp. 2d 1166, 1175 (N.D. Okla. 2009) (addressing state property and tort claims).

### D.    The Tribe fails to demonstrate that it suffered any injury to its quasi-sovereign interests.

The Tribe's invocation of its quasi-sovereign interests is similarly unavailing.  The district court held that the Tribe could not rely on its quasi-sovereign interests to show injury-in-fact because (1) this would require the Tribe to bring suit in its capacity as *parens patriae*; (2) case law bars states from bringing suit as *parens patriae* against the federal government to contest the enforcement of federal law; and (3) even if this limitation does not apply to Indian tribes, here, there was no infringement on the Tribe's regulatory interests (and thus no injury to the Tribe as *parens patriae*) because EPA, and not the Tribe, has authority to enforce the Clean Air Act on the Reservation.  App. Vol. 3

at 666-667.  On appeal, the Tribe disputes the court's second and third

holdings but cannot demonstrate that either conclusion was erroneous.

1.  The Tribe's effort to distinguish Indian tribes from states with

regard to *parens patriae* standing fails because its arguments

misapprehend why states are limited in bringing suit in that capacity

and also overlook the ways in which Indian tribes are similarly

situated.  The Tribe asserts that the preclusion on state standing as

*parens patriae* to sue the federal government derives from the

Supremacy Clause.  Specifically, the Tribe argues that while states

have a "subservient" relationship to the federal government under the

Clause, Indian tribes have an "inter-sovereign relationship."  Br. 21-22.

However, neither of the Supreme Court cases cited by the Tribe

(Br. 20-21) relies on, or even mentions, the Supremacy Clause in their

discussions of *parens patriae* standing.  Rather, those cases emphasize

that states simply have no role to play as *parens patriae* when

challenging the United States' enforcement of federal law against its

own citizens.  As the Court explained, citizens of the states "are also

citizens of the United States."  *Massachusetts v. Mellon*, 262 U.S. 447,

485 (1923).  And states have no "duty or power" to "protect citizens of

the United States from the operation of [federal] statutes" because such claims implicate citizens' "relations[hip] with the federal government" and "it is the United States, and not the state, which represents them as parens patriae" in that regard. *Id.* at 485-486; *see also Massachusetts v. EPA*, 549 U.S. 497, 520 n.17 (2007) (explaining that *Mellon* prohibits suits by states seeking to "protect [their] citizens from the operation of federal statutes"). This explains why a state may sue as *parens patriae* "to secure the federally created interests of its residents against *private defendants*": such a suit does not involve a challenge by another sovereign to the United States' relationship with its own citizens. *Alfred L. Snapp*, 458 U.S. at 610 n.16 (emphasis added); *see also Georgia v. Pennsylvania R.R. Co.*, 324 U.S. 439, 446 (1945) (explaining that *Mellon* "make[s] plain that the United States not the State represents the citizens as parens patriae in their relations to the federal government").

This logic applies equally to Indian tribes and bars them from bringing suit as *parens patriae* to contest the United States' enforcement of federal law. Like citizens of the states, members of Indian tribes are also United States citizens. *See* 8 U.S.C. 1401(b);

*United States v. Lara*, 541 U.S. 193, 203 (2004).  And it is the United States that represents tribal members as *parens patriae* with regard to the "protective measures [that] flow from that status," including the enforcement of federal laws like the Clean Air Act.  *Mellon*, 262 U.S. at 486.  The district court thus rightly held that cases like *Mellon* and *Alfred L. Snapp* are "dispositive" regarding the Tribe's attempt to establish standing as *parens patriae* and intervene to contest EPA's enforcement of federal law.  App. Vol. 3 at 666.

2.  Even if the Tribe's arguments regarding the district court's second holding had merit, the Tribe still cannot show any error in the district court's third holding that, even assuming the Tribe could sue as *parens patriae*, it suffered no injury to its quasi-sovereign interests because EPA is "the primary enforcer of the [Clean Air Act]" on the Reservation.  App. Vol. 3 at 667 (citation omitted).  Under the Clean Air Act, when EPA determines that a person has violated a statutory requirement, permit, or state implementation plan, the agency may enforce the Act by issuing a compliance or administrative-penalty order, or by bringing a civil enforcement action.  42 U.S.C. 7413(a)(1).  As discussed above, tribes that have been approved to exercise enforcement

authority under EPA's Tribal Authority Rule may participate directly in the statute's enforcement on Indian country land.  Save for a few exceptions not relevant here, tribes have the opportunity to be "treated in the same manner as States with respect to all provisions of the Clean Air Act."  40 C.F.R. 49.3.  Among other things, the Act's provisions authorize enforcement of the standards for, and limitations on, the emission of air pollutants.  *See* 42 U.S.C. 7416.  Under the circumstances here, however, where the Tribe has *not* sought enforcement authority under the Tribal Authority Rule, the decision about whether particular enforcement actions and remedies will appropriately resolve Clean Air Act violations and serve tribal members' interests is a judgment call that EPA, not the Tribe, gets to make.

Contrary to the Tribe's assertions (Br. 22-23), the fact that EPA exercises this authority and makes such judgment calls does not injure the Tribe's quasi-sovereign interests.  By treaty, the Tribe gave Congress the authority to regulate on the Reservation "on all subjects connected with the government of the Indians on said reservation . . . as may be thought proper."  Treaty between the United States of America

and the Tabeguache, Muache, Capote, Weeminuche, Yampa, Grand River, and Uintah Bands of Ute Indians art. IV, VII, Nov. 6, 1868, 15 Stat. 619; *see also NLRB v. Pueblo of San Juan*, 276 F.3d 1186, 1190 (10th Cir. 2002). Congress exercised this authority when it enacted the Clean Air Act, entrusting EPA with enforcement of the statute on reservation lands while also providing a way for tribes to participate in that process. *See also* Br. 22 (recognizing that Congress can "limit or divest an Indian tribe of any aspect of its inherent sovereignty as a tribal nation"). EPA's enforcement of the Clean Air Act against Ovintiv thus constituted no "[i]ntrusion" on the Tribe's quasi-sovereign interests (Br. 19) because, having not pursued authority under the Tribal Authority Rule, the Tribe possesses no right to oversee administration of the statute on the Reservation.

3. The Tribe nonetheless argues that its "sovereign prerogative" to balance habitability and "economic subsistence" on the Reservation required EPA to consult with the Tribe and "implement remedial measures" that "advance[d] the Tribe's priorities." Br. 20. This argument suffers from many of the same flaws as the Tribe's contentions about its sovereign interests. First, this logic could permit

standing based on a tribe's quasi-sovereign interests when the government enforces any number of federal statutes on a tribe's reservation without prior consultation, based on that tribe's obligation to safeguard members' physical and financial well-being. But despite the breadth of these implications, the Tribe cites no case law endorsing or adopting this logic to find standing. Second, the Tribe identifies no legal authority that would entitle it to direct EPA's selection of remedies to resolve Clean Air Act violations, despite the significant infringement on executive prosecutorial discretion that such action would represent. *See* p. 31, *supra*. Third, even if the Tribe is only claiming a quasi-sovereign interest in being afforded an opportunity to influence or persuade EPA to take particular enforcement action, the Tribe identifies no legal authority entitling it to such an opportunity— and regardless, the record here makes clear that the Tribe had such opportunities. *See* pp. 2-9, *supra*.

## E.  The Tribe fails to demonstrate that it suffered any economic injury.

1.  The Tribe fares no better in arguing that it incurred economic harm as a result of EPA's failure to consult. The Tribe suggests that EPA's settlement with Ovintiv might reduce the amount of revenue it

receives through oil and gas development on the Reservation in the form of mineral royalties, severance taxes, and fees.  Br. 23.

However, to establish injury-in-fact on this basis, the Tribe must show a "fairly direct link" between the alleged diminishment in "revenue[] and the legislative or administrative action being challenged"—here, EPA's purported failure to consult.  *Wyoming*, 674 F.3d at 1234 (quoting *Pennsylvania v. Kleppe*, 533 F.2d 668, 672 (D.C. Cir. 1976)).  As other appellate courts have explained, "'virtually all federal policies' will have 'unavoidable economic repercussions.'"  *El Paso Cnty. v. Trump*, 982 F.3d 332, 339 (5th Cir. 2020) (quoting *Kleppe*, 533 F.2d at 672).  Consequently, a "fairly direct link" between the alleged loss in revenue and the government action at issue is needed because, otherwise, a tribe or state "could have standing even if 'diminution of tax receipts is largely an incidental result of the challenged action.'"  *Ibid.*

The Tribe establishes no fairly direct link here.  To the extent it argues that EPA's failure to consult with the Tribe regarding the Ovintiv matter resulted in enforcement action that will reduce the amount of oil and gas development on the Reservation, this alleged

harm is "contingent upon speculation [and] conjecture" about how other companies operating on the Reservation might respond, if at all, to EPA's actions. *Tandy v. City of Wichita*, 380 F.3d 1277, 1284 (10th Cir. 2004). Consequently, the Tribe cannot accomplish the "substantially more difficult" task of establishing standing here, *Habecker*, 518 F.3d at 1225 (citations omitted), because the Tribe's alleged economic injury rests on "speculat[ion] about the decisions of third parties" that are not party to this litigation, *Murthy v. Missouri*, 603 U.S. 43, 72 (2024) (citation omitted); *see also Day v. Bond*, 500 F.3d 1127, 1133 (10th Cir. 2007) (requiring a "concrete and nonspeculative injury" to establish standing).

Alternatively, to the extent the Tribe suggests that it will suffer a loss in revenue because FourPoint, Ovintiv's successor-in-interest (*see* pp. 11-12 n.4, *supra*), will curtail its operations on the Reservation, the Tribe points to nothing in the record below or its proposed pleading in intervention to substantiate this claim. *See also* App. Vol. 2 at 488-503 (proposed pleading in intervention). Nor would the Tribe have any reasonable basis for making such an allegation. The consent decree does not disadvantage FourPoint's oil and gas production on the

Reservation, but rather, requires the company to take the same compliance-related actions at *all* of its Utah facilities, both on and off the Reservation. App. Vol. 2 at 375, 463-465. Thus, as above, the Tribe's attempt to demonstrate a "fairly direct link" between its alleged economic harm and EPA's purported failure to consult fails at the outset because the Tribe's "assertions of future lost . . . revenues are merely speculative." *Wyoming*, 674 F.3d at 1235; *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009) (explaining that "speculation does not suffice").

2. The Tribe's broader, conclusory assertion that it suffers economic harm any time "its industry partners face financial burdens" is similarly unpersuasive. Br. 23. The Tribe cites no legal authority for this proposition despite the fact that, as above, similar financial burdens could arise in any number of scenarios where a federal agency resolves a violation of federal law through entry of a negotiated settlement decree. The Tribe's failure to identify any court that relied on such logic to find a cognizable injury-in-fact is telling. It also reflects the challenge of satisfying the heightened pleading burden discussed above—one that the Tribe fails to carry here—which arises when a

party seeks to establish standing based on an alleged diminishment of tax and other revenue from "industry partners," including those not party to the case. *See* pp. 44-45, *supra*.

3. The Tribe also asserts that the lack of any "guaranteed return" from the civil penalties imposed on Ovintiv made it necessary for the Tribe to have a "voice" in EPA's selection of remedies. Br. 24-25. But the Tribe gives no persuasive explanation why its lack of entitlement to a portion of the civil penalties here should trigger an obligation for EPA to have consulted with the Tribe about settlement terms. To the extent the Tribe is suggesting that the enforcement action must financially benefit the Tribe in some way, it fails to identify any source of law requiring such an outcome. To the extent the Tribe contends that consultation was needed to ensure that the remedies included in the parties' consent decree do not unduly harm the Tribe's economic interests, this argument relies on speculation and conjecture about how FourPoint and other independent third parties might respond to the settlement; consequently, this argument fails to establish injury-in-fact. *See* pp. 44-45, *supra*. But regardless, the record shows that the Tribe had "a voice" during EPA's negotiations with Ovintiv. EPA discussed

the matter with tribal representatives on numerous occasions and gave
multiple opportunities for the Tribe to "provide input on the
enforcement action[]" against Ovintiv, including specific remedies that
the Tribe wanted EPA to discuss with Ovintiv.  *See* pp. 7-9, *supra*; App.
Vol. 1 at 286.

4.  Finally, the Tribe states that "EPA's trust responsibility to the
Tribe" required the agency to consult with it about the enforcement
action against Ovintiv.  Br. 25.  Although the Tribe passingly suggests
that the United States' alleged "failure to uphold its trust
responsibility" caused injury to the Tribe's sovereign, quasi-sovereign,
and economic interests (Br. 11), the Tribe only specifically invokes the
United States' trust responsibility in its discussion of economic harm
(Br. 25).  But even here, the Tribe offers no explanation why the United
States' trust responsibility required EPA's consultation with the Tribe.
*See* Br. 24-25.

Accordingly, this argument is waived multiple times over.  The
Tribe waived this argument in the district court by failing to "develop
its arguments related to these potential injuries."  App. Vol. 3 at 662
n.30.  Because the Tribe does not argue in its opening brief that the

district court plainly erred by failing to adopt this trust-responsibility argument, the Tribe has waived this argument on appeal, as well.  *See* pp. 17-18, *supra*.  Alternatively, the argument is waived because the Tribe did not "raise[] and develop[] [it]" in the Tribe's briefing on appeal.  *Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 895 n.6 (10th Cir. 2017); *see also United States v. Walker*, 918 F.3d 1134, 1151 (10th Cir. 2019) (explaining that "arguments may be deemed waived when they are advanced in an opening brief only 'in a perfunctory manner'" (citation omitted)).

Even if this argument were not waived, the Tribe cannot show that the district court plainly erred by failing to find standing based on a purported violation the United States' trust responsibility.  The United States has a general trust relationship with Indian tribes.  *Arizona v. Navajo Nation*, 599 U.S. 555, 565 (2023).  However, because the United States is a sovereign rather than a private trustee, "Congress may style its relations with the Indians a trust without assuming all the fiduciary duties of a private trustee, creating a trust relationship that is limited or bare compared to a trust relationship between private parties at common law."  *Id.* at 565-566 (quoting

*United States v. Jicarilla Apache Nation*, 564 U.S. 162, 174 (2011)).

Accordingly, "unless Congress has created a conventional trust

relationship with a tribe as to a particular trust asset, [courts] will not

'apply common-law trust principles' to infer duties not found in the text

of a treaty, statute, or regulation." *Id.* at 566 (quoting *Jicarilla Apache*

*Nation*, 564 U.S. at 178).  In other words, to prevail on a breach-of-trust

claim, a tribe "must establish, among other things, that the text of a

treaty, statute, or regulation imposed certain duties on the United

States." *Id.* at 563; *see also Flute v. United States*, 808 F.3d 1234, 1244

(10th Cir. 2015).

Despite having found that the Tribe waived reliance on the United

States' trust responsibility, the district court nonetheless agreed with

EPA that "the trust responsibility does not independently create a duty

to consult, and any failure to consult cannot constitute injury absent 'a

treaty, statute, or regulation' requiring it." App. Vol. 3 at 662 n.30.  In

its opening brief, the Tribe neither responds to the court's reasoning,

nor explains how it is plainly erroneous.  Thus, accepting the court's

unrebutted conclusion—which accords with the Supreme Court case law

quoted above—that the Tribe was required to identify a treaty, statute,

or regulation that imposed on EPA a duty to consult in the context of

this case, the Tribe's invocation of the United States' trust

responsibility fails because the Tribe offers no such source of law.[5]

## CONCLUSION

For the foregoing reasons, this Court should affirm the ruling

below.

Respectfully submitted,

ADAM R.F. GUSTAFSON
  Principal Deputy Assistant Attorney
  General

ROBERT N. STANDER
  Deputy Assistant Attorney General

s/ Jason Lee
JASON LEE
  Attorney
  Department of Justice
  Environmental and Natural Resources
   Division
  Appellate Section
  P.O. Box 7415
  Washington, D.C.  20044
  (202) 598-3394

---

[5] The Tribe and EPA recently briefed this issue in *Ute Indian Tribe of the Uintah and Ouray Reservation v. EPA*, No. 25-9531 (10th Cir.), which concerns a permit issued by EPA under Title V of the Clean Air Act.  This Court is due to hear argument in that appeal on January 21, 2026.

## STATEMENT REGARDING ORAL ARGUMENT

Movant-appellant has requested oral argument. The United States believes that the legal issues raised in this appeal are straightforward and would be capable of resolution based on the parties' briefs. However, government counsel stands ready to assist the Court by presenting oral argument to address any questions that the Court might have about this dispute.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 10,180 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it was prepared in Century Schoolbook 14-point font using Microsoft Word for Microsoft 365.

s/ Jason Lee
JASON LEE
Attorney

Date:  January 20, 2026

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

(1)  all required privacy redactions have been made per 10th Cir. R. 25.5;

(2)  if required to file additional hard copies, that the ECF submission is an exact copy of those documents; and

(3)  the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, Windows Defender Version 1.437.129.0 (updated September 24, 2025), and according to the program they are free of viruses.

s/ Jason Lee_____
JASON LEE
 Attorney

Date:  January 20, 2026